IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 1, 2020

## KAYLA RAWSON v. WILLIAM A. MONROE

**Appeal from the Juvenile Court for Rutherford County**
**No. 10553C   Donna Scott Davenport, Judge**

_____

### No. M2019-00472-COA-R3-JV

_____

This case involves modification of a permanent parenting plan.  The father has appealed, arguing that the trial court's order does not contain a sufficient best interest analysis or the requisite factual findings to support its decision.  We have concluded that the order contains sufficient factual findings and the required best interest analysis.  The father did not provide a transcript or statement of the evidence presented before the trial court that would enable us to review the evidentiary basis for the trial court's findings.  As such, we must affirm the decision of the juvenile court.  We grant Mother's request for an award of attorney's fees on appeal.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and FRANK G. CLEMENT, JR., P.J., M.S., joined.

J. Leo Richardson, III, Murfreesboro, Tennessee, for the appellant, William A. Monroe.

John C. Taylor, Murfreesboro, Tennessee, for the appellee, Kayla Rawson.

### OPINION

#### I.   FACTS & PROCEDURAL HISTORY

Kayla Rawson ("Mother") and William A. Monroe ("Father") are the unmarried parents of a child who was born in December 2011.  In April 2014, an agreed order was entered in the Juvenile Court of Rutherford County, Tennessee, establishing parentage and setting forth an agreed permanent parenting plan.  The child was two years old at that

time, and both parents resided in Murfreesboro. Mother was designated as the primary residential parent, and Father was to have parenting time according to a graduated schedule that steadily increased his parenting time over the course of six phases between March and July 2014. Father would begin with three-hour visits at Mother's home twice a week. By the sixth phase, Father would have parenting time every other weekend (from Thursday evening to Sunday evening). However, the parenting plan required Father to exercise all parenting time in each phase before "graduating" to the next phase. In the event that Father missed an entire period of his residential time on a given day, he would have to repeat that week in the graduated schedule.

Two years later, on July 1, 2016, Mother filed a petition to modify the permanent parenting plan. Mother alleged that Father had "substantially exercised" his parenting time during phase one but failed to fully exercise his parenting time during any other phases. Mother claimed that Father visited the child, on average, once per month for a few hours. According to the petition, the child had not stayed overnight with father in over two years. The petition alleged that Father had recently exercised parenting time with the child on Father's Day, but he became angry, left with the child in his vehicle "squealing tires," and refused to answer her calls thereafter, leading to police involvement. Mother also alleged that Father had moved four times over the past two years and that the child did not have a bedroom of his own at any of those residences. She asked the court to modify the previous parenting plan and enter a parenting plan specifying that Father would have daytime parenting time with the child one Saturday per month from 9:00 a.m. to 6:00 p.m.

Father filed an answer and counter-petition. He acknowledged that he had moved to Nashville shortly after the parenting plan was entered in 2014, then to Hermitage, then to Hendersonville. He claimed that Mother stopped allowing him to exercise overnight visitation in December 2014 due to stated concerns about his residence. Thus, Father admitted that he had "missed parenting time" but claimed that it was not voluntary. Father conceded that he "did leave the residence frustrated" on Father's Day and that the police were called. Father denied that the circumstances cited by Mother constituted a material change in circumstances but alleged that her refusal to adhere to the parenting plan constituted a material change in circumstances justifying modification of the existing plan. Father stated that he intended to relocate back to Murfreesboro and asked for an unspecified increase in parenting time.

The record before us contains a lengthy "Final Order" entered by the trial court on November 5, 2018, which states that the matter was heard by the juvenile court judge on June 18, June 25, October 1, and October 3, 2018. Because Father challenges the sufficiency of this order on appeal, we will discuss its contents at length. The order states that the trial court heard testimony from Mother, Father, the child's long-time babysitter, and Mother's two sisters. The child was age six at the time of the hearings. The order described the terms of the graduated visitation schedule set forth in the original parenting

- 2 -

plan and the procedural history of the present litigation.

The order states that after Mother filed her petition for modification on July 1, 2016, she was arrested for custodial interference on July 14. The order states that the warrant was sworn out by Father, not by law enforcement. The trial court had reviewed the transcript of the preliminary hearing on the custodial interference charge against Mother in general sessions court. The charge against Mother was dismissed at the conclusion of the preliminary hearing. However, the trial court discussed testimony given by Father during that preliminary hearing. According to the trial court, Father testified at that preliminary hearing that he did not remember if he had completed the first five phases of the parenting plan, which he claimed Mother was not following. In the present hearing, however, Father had attempted to present evidence regarding that very issue. The trial court questioned Father's attempt to persuade the court that "his memory had now, some two years later, been jogged" by photographs he found. Based on his testimony from the preliminary hearing that he could not remember whether he had completed the phases of the parenting plan, the trial court deemed Father "not credible."

The trial court noted that Father also "changed his answer twice" about an issue during the preliminary hearing. Also during the preliminary hearing, Father acknowledged that a general sessions judge had previously advised him not to call the police again due to this being a civil matter. The trial court found that Father had continued to call the police after the judge's instruction about that very issue.

The trial court found that when Father was working the steps of the parenting plan in the summer of 2014, he delivered the child to the child's aunt "covered in urine, dirty and hungry." The trial court found that Mother tried to include Father in multiple birthday celebrations for the child over the years, but Father attended only one. At the single birthday party that Father attended, he "came with some of his friends" and "there was no interaction between Father and child." The trial court found that Father had not participated in any traditional holidays except "maybe" one Christmas, when he dropped off some presents. The trial court found that Mother had informed Father of the child's ballgames but that Father seldom attended. The court credited the testimony of the child's long-time babysitter, who testified that he had never missed a t-ball game and that he had only seen Father at one game. In short, the trial court found that "Father has not been involved with this child." It found that "Father has not been a regular presence in the child's young life." The trial court noted the testimony of the babysitter that the child's behavior around his father is "awkward," and that "he knew his father, but never ran to him, and that he was standoffish around his father."

The trial court found that Father "knew his way to this courthouse" and was represented by counsel "throughout this entire case." The trial court noted that Father claimed to be well versed on the original parenting plan, but at the same time, he testified that he did not know that he could have had phone calls with the child, received school

records and medical records, and had lunch with the child at school. According to the trial court, "All of these things Father testified that he did not know that he could do, as an explanation for why he did not do them over time."

The trial court found that Father had owned a home in Murfreesboro ever since the original parenting plan was entered in 2014 but that he "had chosen not to live there" and instead chose to rent property and live elsewhere. The court found that Father "chose to live with multiple roommates in multiple locations." It found that he moved to a loft in downtown Nashville in 2014, where he had a roommate and had to share a bedroom with the child. The court found that Father later moved to Hermitage "where he had roommates" and the child had to share a room with his father. Thereafter, the court found, Father moved to Hendersonville where he resided with his girlfriend and her brother, and the child would have to share a room with Father and his girlfriend. Since then, Father had moved back to the home in Murfreesboro, with his girlfriend and her brother. However, the child would have his own room. The trial court found that Father was asked if he informed Mother about these moves to which he simply responded, "She knew."

The trial court placed "great weight" on the testimony of the child's babysitter that Father had once told him, "I lie and manipulate people to get my way." The court noted that this statement "serve[d] to reduce Father's credibility greatly." The trial court noted that "another factor in reducing Father's credibility" was the fact that the trial judge asked Father whether 2016 was his first Father's Day to exercise parenting time, and Father replied that he was not sure.

The trial court also placed "great emphasis" on the fact that Father never completed the five steps on the original parenting plan. Because Father had not completed the steps, the court found that Mother was under no obligation to give Father the full amount of parenting time set forth in the plan. The court found the parenting time Father enjoyed thereafter was at Mother's discretion, and "despite all of the dramatic events concerning law enforcement, arrests and the like, Mother wanted the child to know his Father" and "wanted him to be involved as a dad." The court found that Father's failure to complete the steps of the parenting plan was the barrier that kept him from his child, "not the actions of Mother."

The trial court found that Father had engaged in numerous "inappropriate actions," including, but not limited to, having Mother arrested for custodial interference, which forced her to call the babysitter to come and get the child. In addition, the court referenced Father "camping outside Mother's house" while waiting on law enforcement, taking pictures of himself in her yard with a copy of the parenting plan and posting it on social media. The court deemed that incident "very disturbing" to the court. The court also referenced "Father's inappropriate conduct in June 2016 in the presence of the child." The court found that these were "not the actions of a [f]ather who is just trying to

- 4 -

spend time with his child pursuant to a parenting plan." Instead, the court found that Father's actions were "unnecessary acts of vindictiveness, hatefulness, pure venom, spiteful and malicious[.]" The court found that all of the aforementioned actions constituted "emotional abuse to the child."

The trial court found that Mother had proven the following material changes in circumstances: (1) Father's failure to follow the steps of the parenting plan that would have allowed him more parenting time; (2) Father being "residentially unstable" since 2014, moving to multiple residences with multiple roommates in other counties; and (3) "the parent-child relationship just [beginning] to be repaired in May 2018." The trial court found that "the best interests of the child dictate that the parenting plan be modified." The trial court stated that it had examined all the proof and developed a new parenting plan for the parties that was "in the best interests of this child." The trial court acknowledged that Father "still needs to be involved with the child" but stated that the court "does not trust Father." The court concluded that Father's actions over the past four years demonstrated that he was more concerned about heartache for Mother than a father-son relationship. Due to Father's actions, the trial court found that "standard visitation is not in the child's best interest." The trial court noted that an agreed order had been entered in July 2018 entitling Father to certain parenting time and telephone calls, but "Father made no phone calls to the child." The order states that Father's failure to call the child spoke volumes to the court.

The trial court granted Mother's petition to modify and dismissed Father's counter-petition. The trial court ruled that Father would have parenting time the first Saturday of each month beginning at 9:00 a.m. and ending on Sunday at 6:00 p.m. He would also have overnight parenting time on all Father's Days and during any other traditional holidays that fell during his regular monthly weekends. The trial court entered a new parenting plan to this effect, designating 352 annual days of parenting time for Mother and 13 annual days of parenting time to Father. Father erroneously filed a notice of appeal to circuit court, and the circuit court transferred the appeal to this Court.

## II.  ISSUES PRESENTED

On appeal, Father argues that the trial court erred by "not engaging in a best interest analysis" and failing to comply with Rule 52.01 of the Tennessee Rules of Civil Procedure. In her posture as appellee, Mother raises an issue regarding her entitlement to attorney's fees on appeal. For the following reasons, we affirm the decision of the juvenile court and remand for further proceedings.

## III.   DISCUSSION

When considering modification of a parenting plan, two issues must be addressed: (1) whether a material change in circumstances has occurred, and (2) whether any

modification of the parenting plan is in the child's best interest. *Gricunas v. Gricunas*, No. E2018-02284-COA-R3-CV, 2020 WL 112911, at *2 (Tenn. Ct. App. Jan. 9, 2020) (citing *Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013)). According to the Tennessee Supreme Court,

> A trial court's determinations of whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interests are factual questions. *See In re T.C.D.,* 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). Thus, appellate courts must presume that a trial court's factual findings on these matters are correct and not overturn them, unless the evidence preponderates against the trial court's findings. *See* Tenn. R. App. P. 13(d); *In re C.K.G.,* 173 S.W.3d [714, 732 (Tenn. 2005); *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984))].
>
> Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, *Holloway v. Bradley,* 190 Tenn. 565, 230 S.W.2d 1003, 1006 (1950); *Brumit v. Brumit,* 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997), trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Massey-Holt v. Holt,* 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). Thus, determining the details of parenting plans is "peculiarly within the broad discretion of the trial judge." *Suttles v. Suttles,* 748 S.W.2d 427, 429 (Tenn. 1988) (quoting *Edwards v. Edwards,* 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge,* 42 S.W.3d 82, 88 (Tenn. 2001). A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. *Id.* "An abuse of discretion occurs when the trial court ... appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski,* 350 S.W.3d 99, 105 (Tenn. 2011). . . .

*Armbrister*, 414 S.W.3d at 692-93.

On appeal, Father argues that the trial court applied an incorrect legal standard by omitting any reference to the statutory best interest factors set forth in Tennessee Code Annotated section 36-6-106. Father claims that the trial court "failed to conduct a best interest analysis." He also suggests that the court failed to make sufficient findings of fact and conclusions of law in compliance with Tennessee Rule of Civil Procedure 52.01, which requires trial courts to "find the facts specially" and "state separately its

conclusions of law."

Having thoroughly reviewed the trial court's order, we disagree with Father's assertions. The trial court's order spans thirteen pages and contains 96 separately numbered findings and conclusions. The trial court explained at the outset that pursuant to Tennessee Code Annotated section 36-6-101(a)(2)(C), when the issue before the court is a modification of the court's prior decree pertaining to a residential parenting schedule, the petitioner must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest. After setting forth extensive factual findings, the trial court concluded that "the best interests of the child dictate that the parenting plan be modified." The court stated that it had developed a new parenting plan that was "in the best interests of this child." It specifically concluded that "standard visitation is not in the child's best interest." Thus, it is readily apparent that the trial court did conduct a best interest analysis.

We acknowledge that the trial court's order did not specifically mention the best interest factors set forth in Tennessee Code Annotated section 36-6-106. The trial court was obligated to consider the applicable factors, but "'the statute does not require a trial court, when issuing a memorandum opinion or final judgment, to list every applicable factor along with its conclusion as to how that particular factor impacted the overall custody determination.'" *Deaton v. Williams*, No. W2018-00564-COA-R3-JV, 2020 WL 864990, at *3 (Tenn. Ct. App. Feb. 21, 2020) (quoting *Burnette v. Burnette*, No. E2002-01614-COA-R3-CV, 2003 WL 21782290, at *6 (Tenn. Ct. App. July 23, 2003)). This Court has held that "'the absence of an explicit discussion of each factor does not mean that they were not considered.'" *Grissom v. Grissom*, 586 S.W.3d 387, 399 (Tenn. Ct. App. 2019) (quoting *Keisling v. Keisling*, 196 S.W.3d 703, 723 (Tenn. Ct. App. 2005)).

This Court considered a similar argument under the termination of parental rights statute in *In re Antonio J.*, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at *12 (Tenn. Ct. App. Nov. 25, 2019). The mother in that case argued that the trial court's findings as to the children's best interest were insufficient pursuant to Rule 52.01. We acknowledged that "the trial court did not explicitly reference the factors contained in [the relevant statute]" but found it "apparent" from the trial court's findings that it sufficiently considered the relevant factors. *Id.* We noted that the trial court's factual findings "coincide[d]" with several of the statutory factors and therefore they were sufficient to facilitate appellate review. *Id.*

We reached the same conclusion in a parenting plan modification case in *Bell v. Bell*, No. E2016-01180-COA-R3-CV, 2017 WL 2199164, at *9-10 (Tenn. Ct. App. May 18, 2017). We acknowledged that the trial court "did not identify the statutory [best interest] factors correlative to its findings" and "did not specifically identify the statutory factors it deemed applicable." However, we held that this was "not a fatal error" where the trial court made detailed findings as to the children's best interest. *Id.* at *9. In

substance, the trial court "clearly did make findings as to some" of the factors. *Id.* at *10.

We reach the same conclusion here. The trial court's findings substantively addressed many of the best interest factors. For instance, the statute requires consideration of "[t]he strength, nature, and stability of the child's relationship with each parent," the "degree to which a parent has been the primary caregiver," and "[t]he importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment." *See* Tenn. Code Ann. § 36-6-106(a)(1), (5), (10). The trial court found that Mother had served as the primary residential parent since the child was 26 months old. The court placed great emphasis on the fact that Father never completed the steps necessary to have more parenting time under that original plan. The statute requires consideration of each parent's "past and potential for future performance of parenting responsibilities." *See* Tenn. Code Ann. § 36-6-106(a)(2). The trial court found that Father seldom attended the child's ballgames, attended only one birthday party, and gave him Christmas presents once. It also noted that Father did not exercise the various parental rights set forth in the parenting plan, regarding phone calls, school lunches, etc., and claimed that he was unaware of them. He also failed to make any phone calls as permitted by the temporary order, which spoke volumes to the court.

Another factor for consideration was the "disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care." *See* Tenn. Code Ann. § 36-6-106(a)(4). Relevant to this factor, and the "continuity" factor mentioned above, the court described Father as "residentially unstable." It found that he had owned a home in Murfreesboro throughout the relevant time period but chose to rent residences in other counties and reside with various roommates. The trial court also found that Father once delivered the child to an aunt "covered in urine, dirty and hungry."

In great detail, the court considered the parents' "willingness and ability . . . to facilitate and encourage a close and continuing parent-child relationship" and their likelihood of honoring court-ordered parenting arrangements and rights. *See* Tenn. Code Ann. § 36-6-106(a)(2). The court considered Father's continued practice of calling the police even after he was instructed not to do so by a trial judge. The court noted that Father had Mother arrested for custodial interference when he was the one who failed to comply with the phases of the parenting plan he sought to enforce. The court found that Father had previously stated that he lied and manipulated people to get his way. It found it "very disturbing" that Father camped outside of Mother's home and posted pictures on social media of himself holding the parenting plan and waiting on law enforcement. It described Father's actions as vindictive, hateful, spiteful, and malicious. The court found that "despite all of the dramatic events concerning law enforcement, arrests and the like," Mother still wanted the child to know Father and for him to be involved as a dad. These findings also relate to "[t]he moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child." *See* Tenn. Code Ann. § 36-6-106(a)(8).

As for the "love, affection, and emotional ties existing between each parent and the child," *see* Tenn. Code Ann. § 36-6-106(a)(6), the trial court found that Father "has not been involved with this child" and "has not been a regular presence in the child's young life." It credited the babysitter's testimony that the child behaves awkwardly and acts "standoffish" toward Father, never running to see him. The trial court found that Father's actions "constitute emotional abuse to the child." *See* Tenn. Code Ann. § 36-6-106(a)(11).

"[M]eaningful appellate review is not possible unless the trial court 'puts forth some explanation as to how it reaches its decision in a best interest analysis.'" *Nelvis v. Baptist*, No. W2018-01763-COA-R3-JV, 2019 WL 5566352, at *4 (Tenn. Ct. App. Oct. 29, 2019) (quoting *Grissom*, 586 S.W.3d at 395). However, a trial court's order meets the requirements of Rule 52.01 when the order "disclose[s] to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue." *Lovlace v. Copley*, 418 S.W.3d 1, 35 (Tenn. 2013) (quotation omitted). The trial court provided a detailed explanation in this case. This is not a case where the appellate court was "left to wonder" about the trial court's reasoning. *Grissom*, 586 S.W.3d at 397. In summary, we conclude that the trial court's findings of fact and conclusions of law were sufficient to facilitate appellate review and contained the requisite best interest analysis.

Having concluded that the trial court's order was sufficient to enable appellate review, we now turn to the remainder of Father's brief. The issues he presented on appeal were limited to whether the trial court erred in its decision "by not engaging in a best interest analysis" and formulating a parenting plan "that does not conform with Rule 52.01." Arguably, these issues do not encompass any challenge to the intrinsic correctness of the trial court's best interest determination. Still, Father argues within his brief that the trial court's parenting plan failed to allow him maximum participation in the child's life. He argues that the trial court "erroneously gave improper weight and consideration of the evidence" and reached a decision that was "outside the range of acceptable dispositions." Father suggests that it is the role of this Court to review the trial court's factual findings using the preponderance of the evidence standard contained in Tennessee Rule of Appellate Procedure 13(d).

Our ability to review the trial court's decision was hindered by Father's failure to provide this Court with transcripts of the multiple hearings or a statement of the evidence presented. The only transcript in the record is limited to the trial court's oral ruling at the conclusion of the hearing. "'The absence of either a transcript or a statement of the evidence significantly ties the hands of the appellate court.'" *Hardin v. Hardin*, No. W2012-00273-COA-R3-CV, 2012 WL 6727533, at *4 (Tenn. Ct. App. Dec. 27, 2012) (quoting *Chandler v. Chandler,* No. W2010-01503-COA-R3-CV, 2012 Tenn. App. LEXIS 418, at * 19 (Tenn. Ct. App. June 26, 2012)). "This court cannot review the facts de novo without an appellate record containing the facts, and therefore, we must assume that the record, had it been preserved, would have contained sufficient evidence to

support the trial court's factual findings." *Sherrod v. Wix*, 849 S.W.2d 780, 783 (Tenn. Ct. App. 1992). Thus, "to the extent that resolution of the issues on appeal depends on factual determinations, the lack of a transcript or statement of the evidence is essentially fatal to the party having the burden on appeal." *Cremeens v. Cremeens*, No. M2014-00152-COA-R3-CV, 2015 WL 1946165, at *3 (Tenn. Ct. App. Apr. 29, 2015).

A trial court's determination of whether modification of a parenting plan serves a child's best interest is a factual question. *Armbrister*, 414 S.W.3d at 692. In the absence of a transcript or statement of the evidence, we must presume that there was sufficient evidence before the trial court to support its decision as to the child's best interest. *King v. Daily*, No. M2017-01743-COA-R3-CV, 2018 WL 6266363, at *6 (Tenn. Ct. App. Nov. 30, 2018); *see also Cremeens*, 2015 WL 1946165, at *4 (explaining that without a transcript or statement of the evidence, "we must assume that there was sufficient evidence to support the trial court's best interest determination").

Finally, we address Mother's issue regarding her entitlement to attorney's fees on appeal. Mother argues that Father's appeal was frivolous and had no chance of success given his arguments and his failure to provide the court with a transcript or statement of the evidence.[1] We agree.

An appeal may be deemed frivolous if it is devoid of merit or has no reasonable chance of succeeding. *Duke v. Duke*, 563 S.W.3d 885, 906 (Tenn. Ct. App. 2018). The decision to award attorney's fees for such an appeal lies within the sound discretion of the appellate court. *Id.* "An appeal in which the appellate court's ability to address the issues raised is undermined by the appellant's failure to provide an adequate record may be deemed frivolous." *Williams v. Williams*, 286 S.W.3d 290, 297 (Tenn. Ct. App. 2008); *see, e.g.*, *Moritz v. Tulay*, No. E2013-01528-COA-R3-CV, 2014 WL 5306789, at *9 (Tenn. Ct. App. Oct. 17, 2014) ("We determine this appeal to be frivolous inasmuch as Mother provided no transcript or statement of the evidence from which we could review the propriety of the court's decision regarding modification[.]"); *Linn v. Howard*, No. E2006-00024-COA-R3-CV, 2007 WL 208442, at *5 (Tenn. Ct. App. Jan. 26, 2007) ("[W]ithout a transcript or statement of the evidence, this appeal had no chance of success."); *McDonald v. Onoh*, 772 S.W.2d 913, 914 (Tenn. Ct. App. 1989) (deeming an appeal frivolous where the appellant failed to provide a transcript or statement of the evidence).

## IV. CONCLUSION

For the aforementioned reasons, we affirm the decision of the juvenile court and

---

[1] Father also requested an award of attorney's fees in the conclusion section of his brief. "By not designating this argument as an issue, it is waived." *Fichtel v. Fichtel*, No. M2018-01634-COA-R3-CV, 2019 WL 3027010, at *28 (Tenn. Ct. App. July 10, 2019).

remand for further proceedings to include a reasonable award of attorney's fees incurred on appeal.  Costs of this appeal are taxed to the appellant, William A. Monroe, for which execution may issue if necessary.

_____
CARMA DENNIS MᴄGEE, JUDGE